## Peoples Natural Gas Company Appeal.

Argued March 22, 1960. Before Musmanno, Jones, Cohen, Bok and Eagen, JJ.

reargument refused May 16, 1960.

*William H. Eckert,* with him *Robert M. Jacob, Milton W. Lamproplos, Donald C. Winson,* and *Eckert, Seamans & Cherin,* for appellant.

*John A. Metz, Jr.,* with him *Guy L. Warman,* and *Metz, Cook, Hanna & Kelly,* for appellees.

Opinion by Mr. Justice Musmanno, April 22, 1960:

Some time prior to May, 1958, the Peoples Natural Gas Company (hereinafter to be referred to as the Gas Company) decided to lay a 24-inch gas pipe line from McKeesport in a southwardly direction toward the State of West Virginia. One of their engineers, Vincent G. Phelleps, was placed in charge of surveying and constructing the line from McKeesport to a place called Gibson Station, near Charleroi. Phelleps started surveying the line from the McKeesport end on May 12, 1958, and on May 15, 1958, arrived at a property belonging to Mr. and Mrs. L. G. Curry in Elizabeth Township, Allegheny County. Here he proceeded to mark

the course which was to be followed by those who were to actually lay down the pipe. He did this by driving stakes into the ground, at approximately 100-foot intervals, (with special stakes where the terrain might require it,) across the property. Having completed this operation, he proceeded to draw up a description of the line with measurements so that the Gas Company could, in the exercise of eminent domain, condemn the property (4.06 acres) to be occupied by its conduits, lay the pipe, and pay the property owners for the land taken.

In preparing the description, Engineer Phelleps made an error. In the area of the western limits of the Curry property, he encountered a dirt roadway bordered on the right by a row of trees. At the bottom of the Curry driveway, which debouched on to a thoroughfare called Constitution Boulevard, he found a stone which he assumed marked the northwestern extremity of the Curry property.

He was further led to believe that the driveway and the indicated stone marked the margin of the Curry property because on the eastern side of the driveway, the terrain was hilly, irregular and abounded with bushes, unaligned trees and rough growth, whereas, on the western side of the driveway, and in juxtaposition to the row of trees heretofore mentioned, the terrain dramatically changed to a smooth, well-kept lawn extending for a distance of some 30 feet to a handsome brick house, whose beautiful yard it might well have been. The brick house belonged to the Clyde Jones family which, in point of fact, however, owned only a strip 5.6-foot wide on the eastern side of the house. Although there is no explanation in the record about this, it is quite probable that the Joneses, rather than the Currys, maintained and cared for the lawn, even though they had no title to the land on which it flourished.

Be that as it may, Phelleps made the mistake of accepting the above-identified stone as the northwestern extremity of the Curry property and wrote up his description accordingly. He reported to the Gas Company that the distance between the assumed northwestern end of the Curry property and the staked-out pipe line measured 232 feet.

The Gas Company filed a petition in the Court of Common Pleas of Allegheny County for approval of a bond to ensure payment to the Currys of the amount eventually to be paid for the appropriated easement and right of way.

However, after the petition and bond were duly approved, the mistake made by Phelleps came to light. Engineers for both the Gas Company and the Currys met on the land and agreed that the northwestern extremity of the Curry property was not the stone chosen by Phelleps but a point 25.3 feet further away. Thus, the distance between this correct point and the staked line was 257.3 feet instead of the 232 feet mentioned in the bond.

The Gas Company then went into court and filed a petition to amend its approved bond to show the correct description. The Currys opposed the petition.

The matter came on for hearing in the court of common pleas which dismissed the petition to amend, and the Gas Company appealed. It is the position of the Currys that the Gas Company must be held to the description contained in the unamended bond because when the bond was filed, title to the right of way described therein automatically passed to the Gas Company and it is therefore liable for the taking of the condemned 4.06 acres, as described. This being so, they urge a right to additional compensation for the land which they say would be taken under the amended description sought to be filed in the second proceedings.

But all this assumes what is not true, namely, that two different pieces of land were intended to be condemned. It must be made quite clear at the threshold of discussion that the taking of only one strip of land was ever contemplated, that only one ditch was ever dug, that only one pipe line was ever laid over the Curry property, and that the Gas Company does not intend to lay any other pipe line over the Curry property. It must be equally emphasized that the one and only piece of land marked for condemnation was always the same terra firma marked out and staked on the property.

The Currys were never deceived with regard to the exact location of the pipe line. Not a single spadeful of earth was removed except where the stakes were driven along the route marked on the occasion of the one and only visit Phelleps made to the Curry property for the purpose of staking out the course of the pipe line.

The appellee landowners state that since the real northwest corner of their property is a point that is mathematically and geographically fixed, even though Phelleps assumed it to be 25.3 feet further east than it actually was, the right of way condemned in the bond was a right of way different from the one used for the pipeline. Thus, they argue in their brief that the Gas Company "wants to abandon the right of way taken by it and substitute in lieu thereof another right of way, without payment of compensation to the owners for the first right of way taken."

But this is an argument resting on shadows since the Gas Company never substituted one right of way for another. There is no pipe line 232 feet east of the northwest corner of the Curry property and there never was. Nor was there any intention on the part of the Gas Company to lay one there. And once the amended bond is filed, the phantom right of way, which has a nebulous existence only because of an inaccurate de-

scription, will vanish as any mistake on paper vanishes when the eraser is applied.

All the Gas Company desires to do is to amend the description of the property which appears in the bond. This is not an extraordinary procedure. Lewis in his work on Eminent Domain states (2 Lewis, §561): "The practice of allowing amendments is one which should find favor with the courts, since it saves time and expense, both to the public and to the parties interested. . . . Amendments have been allowed . . . changing the description of a highway asked for, though on appeal, . so as to conform to the way actually laid out and evidently intended to be asked for. . ."

Another authority (Randolph on Eminent Domain, §354), states: "The petition may be amended not only in formal matters, but to rectify substantial errors and omissions. Thus the petition may be amended . . . by altering the description of the property in question. . ."

The Gas Company simply wishes to correct a mistake, a correction which will harm no one. The law is not the harsh, rigid, unrealistic, unreasoning despot it was once assumed to be. The law no longer impales a litigant on a misplaced comma, nor will his rights be decapitated because of the improper crossing of a "t".

To uphold the appellees' position here would work a palpable absurdity. It would create a No-Man's Land through the Curry property which the Currys could not use, the Gas Company does not need or want (since it has already laid its pipe), and which no other person could possibly need or want. To what possible use could anyone put a subterranean 24" hole through someone else's land?

The appellees insist on being loyal to a mistake. To adhere to error when it stands out like an iceberg at sea is like proceeding head-on into disaster because

a pre-determined course of the ship passes through the space occupied by the iceberg.

The argument maintained by the appellees in this case was similarly advanced by the property owner in *Boyd v. Negley,* 53 Pa. 387, but it was not accepted by this Court. In that case, Felix C. Negley, owner of a coal mine, built a lateral railroad over land owned by Mary M. Boyd. Mrs. Boyd petitioned the court to order a removal of the railroad because it had been built on a location different from the one described in Negley's original petition to the Court. Replying to Mrs. Boyd's contentions when the case reached this Court, Justice STRONG, speaking for the Court said: "It is said the route upon which the railroad has been built does not correspond with the route described in the petition. There is no substantial variance between the line of construction and the line of location, as it was surveyed and marked upon the ground. But there is a slight variance between that line and the description of it contained in the petition. A mistake was manifestly made in the description. But the true and authorized line of the road, is that which was surveyed by the petitioner and marked upon the ground. The description is but evidence of the line. The mistake in this case was the omission of one section about 30 feet in length. It was undoubtedly amendable at any stage of the proceedings, and hence, if necessary, we will treat it now as amended, especially as the damages have been assessed for the route actually appropriated."

The Act of 1885, May 29, P.L. 29, §10; 1897, May 11, P.L. 50, §1; 1927, April 5, P.L. 115, §1, provides: "Prior to any appropriation, the corporation shall attempt to agree with the owner as to the damage properly payable for an easement in his or her property, if such owner can be found and is sui juris; failing to agree, the corporation shall tender to the property owner a bond with sufficient sureties to secure him or her in the payment of damages; if the owner refuse to accept

said bond or cannot be found or is not sui juris, the same shall then be presented to the court of common pleas of the proper county, after reasonable notice to the property owner by advertisement or otherwise, to be approved by it. *Upon the approval of the bond and its being filed the right of the corporation to enter upon the enjoyment of its easement shall be complete.*" (Emphasis supplied.)

Relying on this statute the appellees reach the conclusion that the easement of the Gas Company came into being when the bond was filed. However, the statute does not prohibit, nor should it be interpreted as prohibiting, the correction of a bond when a mistake has occurred—not, as to the actual property to be taken, but as to description of that property. The only blemish in these whole proceedings consisted of a slight incorrection in writing up a description of the right of way both parties understood to be the correct right of way. To allow such a casual oversight to become the cornerstone of a substantial injustice would be to glorify error and enthrone technicality.

Chief Justice MAXEY, holding that the law should not become a vehicle for injustice, quoted with approval in *Null v. Staiger*, 333 Pa. 370, 375, what Judge ENDLICH said in Section 258 of his work on Interpretation of Statutes, namely: "It is obvious that the administration of justice requires something more than the mere application of the letter of the law, designed for some particular class of ordinary cases, to all others, however modified by accident or withdrawn by extraordinary circumstances from the spirit of its enactment. It follows that 'general terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence.'"

Thus, the Act of 1885, supra, must not be read in a way which would "lead to injustice, oppression or an absurd consequence." For instance, if a condemnor

described Building A as the building to be destroyed on X's property, when he really meant Building B, and X knew the condemnor meant Building B, X could not successfully contend that he would be entitled to payment for Building A and then require the condemnor to initiate new proceedings to condemn Building B.

There cannot be a freezing of rights until the fluent facts are in their proper molds.

But, it is argued by appellees, that if there was a mistake, the mistake was committed by the Gas Company alone and that, therefore, being a unilateral mistake, it may not, under the rule of law governing mistakes, be corrected without the consent of the opposing party. But it must be repeated that the appellees knew at the outset where the Gas Company intended to lay its pipe, its course having been marked out by stakes as early as May, 1958. It follows, therefore, that the appellees either also thought that the description in the bond correctly described the right of way or they knew that the description in the bond did not correctly describe the right of way. In the former case, there would be a mutual mistake; in the latter, there would be a unilateral mistake with knowledge thereof by the appellees. In both instances, reformation would be permitted: *Overholt v. Reliance Ins. Co.,* 319 Pa. 340.

The day when an innocently aggrieved party could be denied a hearing in the courts because of a technical mischance is happily in the past. The attainment of justice is over the highway of realities and not through the alley of technicalities.

None of the authorities cited by the appellees support their position in this litigation. Taking up three or four of the cases discussed in their brief, we find that in practically every instance the condemnor changed his mind as to what he wanted, and, in doing so, subjected the property owner to a loss or to a sub-

stantial disadvantage. None of the cases dealt with a mistake in the *description* of the condemned property. Thus, in the case of *Wood v. State Hospital*, 164 Pa. 159, this Court said: "Whenever it clearly appears, as it does in this case, that there has been such an actual taking under the power of eminent domain, as invests the donee of the power with title, and gives to the landowner a vested right to compensation, *the former should not be permitted to discontinue* without the consent of the latter." (Emphasis supplied.)

In the case at bar, the Gas Company is not attempting to discontinue its action of eminent domain. It stands ready to pay the appellees for the property taken.

In the case of *Dilts v. Plumville R.R. Co.*, 222 Pa. 516, the railroad condemnor appropriated more land than it wanted or needed. It tried later to relinquish some of the land it had condemned. We held it was "not within the power of the appellant company, against the objection of the appellee, to renounce any part of the right of way or reconvey it to her, so as to prevent her from recovering the damages which she had sustained."

The Gas Company here is not attempting to renounce any part of the right of way it condemned.

In the case of *Ferguson v. P. & S. R. Co.*, 253 Pa. 581, this Court held, as stated in a headnote: "After the commencement of condemnation proceedings, a railroad company cannot, without plaintiff's consent, diminish the amount of damages by conceding any of the rights which it has acquired by such proceedings, or by a discontinuing or abandoning the whole or any part of the right of way or any right acquired below or above the surface."

In the instant case there is no attempt being made to discontinue or abandon the right of way condemned, or diminish the amount of damages payable to the landowners.

And then in *McGunnegle v. P. & L. E. R. R.*, 269 Pa. 404, our Court said: "The railroad company, by the appropriation of the land of Maria McGunnegle and the filing of its bond to secure compensation in 1903, then acquired the use for corporate purposes of all the property described in its petition, which belonged to her; and, having so appropriated, no power existed on its part to defeat the claim for damages, or diminish the amount thereof, by abandoning the location."

It must again be emphasized in the case at bar that the Gas Company is not abandoning the easement it intended to condemn from the very beginning.

The appellees have not called to our attention a single case, nor have we been able to find one by independent research, which holds that a mistake made in the description of a right of way to be taken through exercise of eminent domain, may not be corrected. It would be strange if such a case should exist. It would be paradoxical in the extreme if the law, whose principal purpose is to correct mistakes and redeem grievances to the extent that this may be done by law, would refuse to grant relief where the mistake is as obvious as it is here, where no one has been injured by the mistake and where the rights of no third parties have intervened.

While we have ample authority in Pennsylvania to justify the correction prayed for, it is reassuring to know that there are cases beyond the borders of our State where corrections were made in similar circumstances. In the case of *Young v. Laconia*, 59 N.H. 534, the condemnors erred in describing land to be taken for the construction of a new highway. The New Hampshire Court allowed the description to be corrected, saying: "The mistake was in supposing that Baldwin street was a highway ninety-one links further south than it had in fact been laid. It does not appear that any one has been harmed by this mistake, or that any

one acting in good faith could be harmed by it; and it is no cause for reversing the proceedings. An amendment of the petition may now be made, describing the highway as beginning at the southerly end of Baldwin Street."

The order of the Court below is reversed with a procedendo.

Mr. Chief Justice JONES took no part in the consideration or decision of this case.

----

DISSENTING OPINION BY MR. JUSTICE BOK:

It is good-natured of the Majority to let the gas company undo its mistake, but it is wholly illegal. We have called the power of eminent domain, somewhat sententiously, awesome and arbitrary: *Brown & Vaughn Dev. Co. v. Commonwealth,* 393 Pa. 589 (1958), 143 A. 2d 815. And we have found this awe to exist on both sides, in the condemnor's power and in the condemnee's right to compensation. The power is an inherent right of sovereignty and can be exercised only in the manner provided by the Legislature: *Philadelphia Clay Co. v. York Clay Co.,* 241 Pa. 305 (1913), 88 A. 487.

This manner of exercise is set out in the Act of May 29, 1885, P.L. 29, as amended, 15 PS §2033. In providing for a bond, the Act says: "Upon the approval of the bond and its being filed the right of the corporation to enter upon the enjoyment of its [condemned] easement shall be complete."

The instant the bond is approved it becomes the equivalent of cash, the owner's right to compensation becomes vested and absolute according to the bond, and title to the land condemned actually passes to the condemnor: *Ralston v. Equitable Gas Co.,* 70 Pa. Superior Ct. 188 (1918); *Wood v. Trustees of State Hospital,* 164 Pa. 159 (1894), 30 A. 237; *Fischer v. Catawissa R. R. Co.,* 175 Pa. 554 (1896), 34 A. 860; *Dilts*

*v. Plumville R. R. Co.,* 222 Pa. 516 (1909), 71 A. 1072; *Ferguson v. P. & S. R. R. Co.,* 253 Pa. 581 (1916), 98 A. 732; *McGunnegle v. Pittsburgh & Lake Erie R. R. Co.,* 213 Pa. 383 (1906), 62 A. 988; *McGunnegle v. Pittsburgh & Lake Erie R. R. Co.,* 269 Pa. 404 (1921), 112 A. 553; *Goodman v. Bethlehem,* 323 Pa. 58 (1936), 185 A. 719; *Philadelphia Appeal,* 364 Pa. 71 (1950), 70 A. 2d 847.

In *Dilts* we said: "The owner's right to possession had been divested, and her right to compensation had vested and been secured by the bond. At any time after the acceptance of the bond by the owner, if the appellant's property and franchise had been mortgaged or sold, the title to the right of way would have passed, unencumbered by the owner's claim for damages. The purchaser would have taken the title to the part of the right of way proposed to be renounced, and the owner would have been compelled to look to the bond for her damages. . ."

And summed up in this way: "But where a railroad company under the right of eminent domain enters for the purpose of appropriating land for its right of way, fixes the width of its appropriation which is approved and adopted by its board of directors, gives a bond to secure the damages resulting from such appropriation, and actually occupies and constructs its road on the land, the railroad company cannot thereafter refuse to take any part of the right of way so as to defeat the owner's right to damages for the width originally fixed by the company. . ."

In *Ferguson* we said: "The learned court, therefore, did not err in refusing to permit the defendant company to amend its petition" after bond, and in *McGunnegle,* which was a proceeding to correct the description of the land taken, we said: ". . . the defendant moved to amend the description of the property condemned by striking out the words, 'together

with all the land lying between the harbor line and the low water line of the Ohio River.' This was objected to as coming too late; and, further, upon the ground that the railroad company, having filed its bond, could not, without consent, abandon any portion of the land condemned.. The position taken by the plaintiff was sustained, and the amendment was refused. On appeal by the railroad company, this action of the court below was subsequently approved: McGunnegle v. P. & L. E. R. R. Co., 213 Pa. 383."

The Majority completely misconceives the function of the bond. It not only fixes the rights of the parties as written, but it legally converts the property into cash and works the actual passage of title. It is wholly irrelevant that a mistake was made, for it could have been corrected at any time before the bond was approved: after that point title passed, mistake or no. Nor is it important whether anyone was deceived or harmed.

The Majority says that the gas company "simply wishes to correct a mistake, a correction of which will harm no one. The law is not the harsh, rigid, unrealistic, unreasoning despot it was once assumed to be," and more to like irrelevant effect. As far back as *Wood v. Trustees,* supra (164 Pa. 159), we said: "Whenever it clearly appears, as it does in this case, that there has been such an actual taking under the power of eminent domain, as invests the donee of the power with title, and gives to the landowner a vested right to compensation, the former should not be permitted to discontinue without the consent of the latter. *Any other rule would be productive of oppression and other mischievous results.*" (Emphasis added.)

Since the approval of the bond is an actual taking, a moment's thought should suffice to convince anyone that to allow lawsuits because of "mistakes", actual or contrived, after a clearly defined point, would play

240

havoc with public works, the title to property, and the rights of owners.

The gas company began its survey on May 19, 1958, and presented its petition to approve its bond on August 25, 1958. It had ample time to discover its error and to correct it, and it has no one but itself to blame. We are not faced with a liberal concept of amendment but with statutory and decisional pronouncements of when title passes and rights vest. Hence we have no right to be amiable.

Mr. Justice BENJAMIN R. JONES joins in this dissent.